GREAT AMERICAN INDEMNITY CO. et al. v. FLOUR CITY ORNAMENTAL IRON CO. et al.

No. 355.

District Court, W. D. Louisiana, Shreveport Division.

Feb. 18, 1943.

H. B. Barrett, of Shreveport, La., for plaintiffs.

J. D. Rusca, of Natchitoches, La., and R. P. Hunter, of Shreveport, La., for defendants.

---

[12] IX So.Cal.Law Rev. pp. 32–33.

DAWKINS, District Judge.

M. T. Reed Construction Company (hereafter called Construction Company) made a contract with the Police Jury of Natchitoches Parish to construct a new courthouse, with funds partially furnished by the P. W. A. It subcontracted the furnishing of certain window frames, doors, etc., to the defendant, Flour City Ornamental Iron Company (hereafter called Flour City). The latter filed a lien against the project and threatened to sue the principal contractor in the courts of Minnesota. Thereupon the present suit was brought by Reed Construction Co., and the surety upon its bond, for a declaratory judgment, fixing their liability under the subcontract and bond, and for damages alleged to have been caused by delays of the Flour City in performing its contract. The Police Jury, having been made a party defendant, deposited the balance due to the general contractor and was discharged from the case.

A motion to dismiss, and in the alternative, for a bill of particulars, having been overruled, defendant answered, denying that it was at fault, and by counterclaim, prayed for judgment for the balance alleged to be due, with interest and attorneys' fees.

The issues are largely of fact. The contract between the Construction Company and the Police Jury was dated March 8, 1939, while that with the Flour City was signed April 24th of the same year. The latter agreement stipulated that the work undertaken should be "in accordance with the general conditions of the contract * * * and * * * the drawings and specifications"; that it be completed "without delay" to the general contractor. "Subcontractor agrees to pay general contractor cost of any delay to work caused by him. Subcontractor further agrees to have his work completely in place, ready for final inspection by the time the general contractor has completed general contract and subcontractor agrees that if he does not meet this completion date, he will bear all penalties charged to contractor because of his failure to so perform, including overhead and expenses of general contractor and any other subcontractor, due to such failure". The last quoted verbiage was typed into the printed form.

In brief, counsel for defendant, before discussing the facts, contends that the petition and proof did not establish grounds for relief under this language. We quote below material portions of the complaint:

"That due to the delay caused by the failure of the subcontractor to perform its work with diligence, and as required by the subcontract, the M. T. Reed Construction Company sustained the following items of actual damage, which it is entitled to be repaid by the Flour City Ornamental Iron Company, and to claim from that company in the adjustment of their rights:

| | | |
|---|---|---|
| Overhead as shown on pay rolls | 1,736.31 | |
| Additional labor on mill work | 387.00 | |
| Labor firing boiler for temporary heat | 112.00 | 2,235.31 |
| Compensation insurance and public liability @ | 10.01 | 223.76 |
| Builders Risk Insurance—three months | | 155.10 |
| Social Security & Old Age Benefits—4% | | 89.41 |
| Gas Bills—three months —for temporary heat | | 351.20 |
| Light Bills—three months | | 61.98 |
| Expense of Owner, charged Reed Construction Co. | | 329.50 |
| Percentage Office overhead—three months | | 793.80 |
| Interest 3 months on $19,964.38—retained percentage of contract price @ 5% | | 249.55 |
| Total charges | | 4,489.61" |

The word "cost" in the sense it is used here, it would seem, was meant to cover any additional outlay the general contractor might have to make due to the failure of the subcontractor to perform as agreed. This is borne out by the words "including overhead and expenses of general Contractor". Taking the items up in the order alleged, "overhead" is specifically included. "Additional labor on mill work" undoubtedly means that it was performed, over what was contemplated, due to the alleged delay; "labor firing boiler for temporary heat" was an expense incurred in heating the building and to keep it dry, due to the failure to install windows; "compensation insurance and public liability" is charged on a pro-rata basis covering the additional period alleged to have been caused by the delay; "social security and old age benefits—4%" was evidently calculated on the additional labor; "gas bills —for three months—for temporary heat" refers to the heating of the boilers; "light

bills—three months" was occasioned by having to close the windows in which frames had not been installed, with canvas; "expenses of owner" charged Construction Company is covered by an item paid or credited to the Police Jury for the keep of prisoners, etc., during the period of the delay; "percentage office overhead—three months" has reference to the expense of maintaining the general contractor's office over the alleged three months of delay; and "interest three months on $19,964.38—retained percentage of contract price at 5%" is based upon the withholding of the funds by the Police Jury during this period, which it is alleged would have otherwise been paid to the general contractor but for the delay. I am of the opinion therefore, that the defendant's contention as to these items on the face of the pleadings, is not tenable.

On the facts, approximately 450 pages of testimony were taken, and almost 100 documents were introduced. However, the important facts hinge largely on the documentary evidence. The principal contract was dated, as above stated, March 8, 1939, and work began on the 27th following, in accordance with work order from the architects and the 300 days in which it was to be completed, expired January 20, 1940, but it was not finished until March 21, and was formally accepted by the Police Jury on March 29, 1940. The contract carried a penalty clause providing liquidated damages at $20 per day for failure to complete the work on schedule. On March 25, 1940, four days before acceptance, the Construction Company wrote the Police Jury, requesting "an extension of sixty-nine days to complete our contract * * * waiving liquidated damages to the extent of this additional time", for the reason that the "owner and architects have made numerous changes, such as changing the jail equipment and elevator, additional electric, plumbing and heating work, rearranging partitions, etc., all of which required considerably more time". This request was approved by the architects and granted, thus eliminating all demurrage and delay penalties, which otherwise might have been claimed by the Police Jury. It was proven by the Construction Company, and not refuted, that the placing in the request for extension of the statement that the "owner and architects have made numerous changes" was done to avoid questioning by the P. W. A. when, in reality, the delay had been caused by Flour City's failure to timely furnish and install the windows.

The subcontract bound Flour City to perform its work in accordance with the contract and specifications of the general contractor, and specifically to

"Furnish and install completely in place all aluminum sash, * * * with necessary caulking, weather stripping, glass, putty and glazing, hardware and window stools, and metal screens;

"And furnish and install completely in place all aluminum work, pages S-25 and S-26 of specifications; and any other aluminum work * * * shown in specifications or indicated on plans, exactly according to plans, and specifications, and to meet full approval of Architects and General Contractor."

The specifications for windows, provide:

"All windows except on jail floor shall be Browne Folding Type Model No. 6-A, or side hinged casements to be Polachek Type A as manufactured by General Bronze Corp. Kawneer Heavy weight Selair casements as manufactured by Kawneer Co., or equal. To have integral or unit sub-frames.

"All jail floor windows shall be tandemly operated Sealuxe windows, Universal Building Products Company, General Bronze Corporation, Flour City Ornamental Iron Co., or equal".

* * * * * * * *

"Hardware shall be solid white bronze and each unit to be equipped with cremone bolt with threepoint locking device, bronze pull on inactive leaf, and bronze sill adjusters, all in bright silver finish.

"Each operating leaf is to have three five-knuckle bronze butts. This manufacturer shall provide aluminum beads for inapproved window cleaning bolts."

* * * * * * * *

"All windows furnished under this contract shall be equal in design, construction and finish to the Sealuxe window of aluminum by Universal Building Products Company, General Bronze Corp., Flour City Ornamental Iron Co. or equal."

On May 19, 1939, the Construction Company wired Flour City, requesting that it advise by telegraph "when will receive details, doors, windows, Natchitoches Court house" and received reply that they would be "submitted June first". Again, on June 26th, similar message was sent advising Flour City that "your failure to submit acceptable window details Natchitoches Parish courthouse is delaying job. Impossible to fabricate stone until approved details

are received. You are therefore to be charged with any delay incurred on this job due to your failure to submit acceptable details. Advise by wire when architects will receive same." In its reply, dated the same day, the Flour City wrote that it did not "know what you mean by submitting 'acceptable window details'", and stating that it had "submitted for architects' approval to your office on June 6th, prints of our shop drawings Nos. 1–4, showing details of aluminum double hung windows for jail portion of building, and we have had no word whatever stating whether or not these details are acceptable. Our shop drawings for the remaining windows on the job are being mailed to you to-day. Will you please have the architects give our drawings immediate attention * * *".

On June 9, 1939, the Construction Company had written Flour City, saying, "Re courthouse and jail Natchitoches, Louisiana, henceforth, whenever any drawings or details are submitted for approval, please send same direct to our job office at Natchitoches, Louisiana, on the above mentioned project. This will expedite approval". Then, on June 12th, the Construction Company had written to the architects saying, "We are to-day forwarding you two copies of prints for your approval for aluminum windows".

On June 27th, Flour City wrote the Construction Company that it was submitting for the architects' approval "three each of our shop drawings Nos. 1–3 and 2–3, details of aluminum casement windows * * *". It asked that it be notified of the architects' approval of these "as well as * * * our shop drawings Nos. 1–4 * * * which we submitted for approval on June 6th". On July 3d, the Construction Company addressed a letter to the architects, stating, "We are to-day forwarding you the following, two prints each of 1–2, 2–3 and 1–4", which evidently meant those referred to as having been sent on June 6 and 27th respectively. In the meantime, on June 28th Flour City wrote "we are submitting herewith for architects' approval three prints of our shop drawings Nos. 1–4, showing tandemly operated hung aluminum windows for jail portion of the building". This letter is a carbon copy but was offered by the Construction Company as its exhibit.

On July 22, Flour City wrote the architects that "complying with your request of July 8th, we are sending you herewith the following in connection with aluminum double hung windows and aluminum casements, which we propose to furnish on the above project". These included report of laboratory air filtration test made February 14, 1936, by one Robert W. Hunt, similar report dated July 19th (presumably 1939) by the Mechanical Engineering Department of the University of Wisconsin, together with certain samples of materials. Flour City concluded with the statement it was hoped that this would give "all the information which you require in order to pass favorably upon our details as submitted."

The next communication was dated August 3 (also offered by plaintiff) and was from Flour City stating that "it will appreciate architects' early consideration of the following of our shop drawings submitted with our letter of July 19th". This dealt with portions of the work other than the windows. On August 7th the Construction Company forwarded this letter of August 3d from the Flour City to the architects, and asked them to "help us out on this"; and under date of August 10th, the architects returned to the Construction Company, among other shop drawings, Nos. 1–4, 1–3, and 2–3. On August 12, the Construction Company wrote Flour City, forwarding "approved drawings Nos. 1–4, etc.", but as to Nos. 1–3 and 2–3 requested it to "note the attached copy of letter which we have" from the architects, which evidently meant the one of August 10, above mentioned. Under date of August 19th, Flour City wrote the Construction Company regarding the letter "of August 12, 1939, which you sent us and copy of architects' letter of August 10th requesting us to revise and resubmit our shop drawings Nos. 1–3 and 2–3 * * *" and stating "will appreciate architects' reconsideration" of those recommendations; and on the 22nd requested "advise as to the present status of this project * * * so that we can plan our work accordingly".

On August 30th, Flour City again wrote Construction Company, referring to this letter of the 19th, but stating it would "appreciate architects' early advice" with regard to certain revisions, which the architects requested in their letter of August 10th in connection with our drawings 1–3 and 2–3".

On September 5 Flour City addressed Construction Company, stating that on August 28th, it had requested "advise upon the present status of this project" and asking

that "you please let us have this information", and on the next day, followed a second letter, saying "it is necessary that we get immediate action on our shop drawings Nos. 1–3 and 2–3 * * * which we submitted for architects' approval on June 27th". It also referred to its letter of July 22 by it to the architects in which it had sent certain samples, etc., as referred to in the letter of that date, mentioned earlier in this opinion.

On September 8, the Construction Company wrote Flour City in response to the latter's letter of September 6th, that "* * * we are advised by the architects that the details submitted by you do not conform to the requirements of their plans and specifications". Other portions of the letter are as follows:

"This matter was discussed at length with you before purchase was made. The writer was further assured that your product would be exactly as specified. The writer has further advised the architects that he would not ask for any changes in the details of the windows which are specified.

"It is our opinion that we will not request P. W. A. interference in this matter as we are not assured that the different types of windows can be secured.

"We will need these windows on October 1st, along with exterior door openings. We hope that you will not cause delay to this project by your failure to submit satisfactory details, and rush fabrication of your product."

In response Flour City on September 12th wrote at length saying that "details of windows submitted by us for approval do conform to the requirements of the plans and specifications". Certain arguments were advanced as to what had been done by Flour City to expedite the matter, and stating: "Drawings showing these changes are being rushed for approval, and we are asking that he (the architect) wire approval so there will be no further delay."

On September 16th and 18th Flour City wired Construction Company to send "special delivery full set stone shop drawings" and on the 18th also wrote, saying "that in order to get something definite in the way of approval of our details" on the windows "we have endeavored to make the changes requested by the architects and are submitting herewith for formal approval three prints each of our shop drawings Nos. 1–3 and 2–3". Further argument was made as to conformation with the plans and speci-

fications of what previously had been submitted and the letter concluded, "will you kindly urge the architects to give drawings 1–3 and 2–3 their immediate attention and should they prefer some other type of sill adjuster, please have them note this on the blueprints, but in any event, do not hold up approval of the entire window details merely because of the type of sill adjuster".

On the same date another letter was written in reply to what it described as the Construction Company's request, dated September 13th, that Flour City have "aluminum spandrels on the job not later than September 20th, 1939, if possible. It is absolutely out of the question to have these spandrels on the job in September * * * and we asked you on August 22 and September 5th to advise us as to the present status of the project and to give us a progress schedule * * * but we heard nothing from you and naturally assumed that work at the building had reached a point where there was no particular rush about the metal work." It was then explained that spandrels could be installed after the masonry work was up.

On September 20th the Construction Company wired Flour City to "send tests and section of Natchitoches windows' as specified to architects to-day without fail", and on the same day wrote a letter to the architects forwarding * * * two copies each of revised drawings for aluminum windows as submitted" by Flour City "for their approval". Flour City replied to the telegram on the same day, that "window opening sizes, etc., that * * * windows will fit properly when they are delivered * * *. If you have not yet returned approval of prints of our shop drawings 1–3 and 2–3, we trust that you will endeavor to do so immediately so that we can get the windows into production". On the following day, September 21st, Flour City wired the Construction Company "* * * * See our letter of July 22nd to architects with certified report of tests of our aluminum casements, also actual samples casement section with felt strip. What more do you need? We have complied with specification requirements. Have no further material on hand". On September 25, another letter was written saying, "we are still awaiting receipt of approved prints of our drawings Nos. 1–3 and 2–3, details of aluminum casement windows, which we again submitted with our letter of September 18th."

On September 26th, the architects wrote the Construction Company "we are returning herewith one copy of revised drawings * * * as submitted by Flour City. These drawings are being returned subject to corrections as noted thereon and conditions as follows: (1) dealing with weather stripping and (2) "infiltration tests of 5' 6" units * * *, to be submitted to Washington University, c/o H. L. Ohle, for tests". On the same day, September 26th, Flour City wrote acknowledging receipt of telegram of the Construction Company in which "you state our failure to submit acceptable window details * * * is delaying the job as it is impossible to fabricate stone until approved details are received. We do not know what you mean by 'acceptable window details'. We submitted for architects' approval on June 6th, prints of our shop drawings 1–4, showing details * * * windows for jail portion building, and we have had no word stating whether or not these details are acceptable." Again, on September 28th, Flour City wrote "not having heard further from you since we wired you on September 21st, 1939, in connection with approval of * * * casement windows * * * we are wondering what has developed in the meantime. It is imperative that we get immediate approval of our shop drawings Nos. 1–2 and 2–3 so that we can get started on the fabrication of these windows", and stated that it was sending "full size section #8 our drawings 1–3 * * * in the event the architects' insist * * * kindly advise us further developments". On September 28th Construction Company wired Flour City "jail windows must be installed before masonry work can be built. Must have jail windows at once. Wire shipping date now"; and on September 30th wrote the following letter to Flour City:

"The writer has just returned from a visit to the architect's office in the interest of the details which you have submitted for casement windows. After careful check of these details and the sections which you have submitted I am of the opinion that the architect is correct in refusing to approve your details. The sections that you have submitted are sections for jail windows and not the casements as requested.

"The details you have submitted on the casement are not typical of the three windows specified, namely, Brown, Kawneer, or General Browne. Mr. Westphal assured the writer when the order was placed for this material that he would furnish one of the three above mentioned windows, or an exact duplicate, and so far you have refused to submit details conforming to this.

"We advised you early this month the need for these windows and all exterior openings not later than October 1st, and after that date work on this project will have to be suspended until you install your materials. I tried in two telegrams to you this week to convince you of the need of jail windows, as they must be installed before the masonry work is completed, in my opinion. There are permanent prison guards placed on the inside of the exterior concrete walls, thereby making it absolutely necessary for windows to be installed from the exterior, but since you insist on installing them after the masonry work is completed, we are proceeding according to my telegram to you dated September 29th. Just how you will install them I don't know.

"In your letter of July 12th, second paragraph, you refer to the specifications pertaining to the jail windows, which is correct. However, if you will refer to the specifications pertaining to the casement windows, you will find your company's name is not mentioned, and Mr. Westphal was familiar with this condition when he figured the job.

"We will appreciate your immediately preparing details for casement windows to conform to specifications, and would suggest you submit these details to the architect in person or by one of your engineers, to speed up approval of same, as delay caused by shut down of this project is going to be rather expensive.

"We are now operating right on our time schedule, and the owners are going to be very muchly disappointed when this job is shut down by your failure to submit details as called for, thereby causing this delay, and I feel sure that they will also charge us with the penalty as set down in our contract.

"Please advise this office at once your decision in this matter, as it is urgently necessary that we have windows delivered to this job at once."

And on the same day Flour City wrote Construction Company, (the two letters apparently crossing in the mails) as follows:

"Referring to your second telegram of September 29 regarding setting of jail windows we note that you refer us to Architect's drawing A4. We do find an indication of inside grilles on Architect's drawing A4, but the larger detail of jail win-

dows shown on Architect's drawing A7 definitely does not show grilles on the inside. If, however, inside grilles are to be furnished, it means that the inside grilles can not be set until the windows are in place, and the windows can not be set from the outside after the stone work is up.

"As the matter now stands we can not make immediate shipment of the jail windows due to the fact that some of the materials have not yet arrived from the Aluminum Company's mills due to congestion of government orders which the Aluminum Company must give preference. The aluminum material for these windows is scheduled for shipment to us from the Aluminum Company's mills on October 7, which means that this material will not arrive in Minneapolis until October 11th or 12th, and the windows can not be ready for shipment until approximately November 1st.

"Inasmuch as you state that inside jail window guards must be built into concrete and that windows can not be set from the inside, it will be necessary to hold off setting of stone at jambs and heads around jail windows until the windows have been set."

The Construction Company answered on October 4th, outlining the conclusions with respect to the details of the windows and adding "these walls have been poured about six weeks now and the masonry work will be completed this week * * * and as advised in my letter of September 30th, work will be suspended on this entire project until you can furnish and install completely all the openings as called for in your contract with us. You have had since May to prepare shop drawings and fabricate materials as required for this project.

I find no reply to this letter.

The next communications which are found, are, first a letter from the Construction Company to Flour City, dated November 20th, advising that arrangements had been made with the architects to "temporarily close openings (windows) * * * in order to proceed with plastering. We are doing this with the full understanding that all labor and materials necessary for this work shall be paid by you; also any damage that might occur due to the type of enclosure being used in the building". This was acknowledged with the statement that "before instructing you to proceed * * * we would appreciate your estimate of the costs of * * * closing * * *

75 openings where casement windows are to be installed later". Again, on December 5th, Flour City wrote saying it had had no response to this letter of November 22 and that it "will appreciate answer"; again on December 13, 21 and 28 it requested this information. Finally, on December 30, the Construction Company answered that it would cost $111.45. This was allowed by the Flour City as a credit on its account.

January 8, 1940, in response to inquiry as to when windows would be shipped, Flour City wired Construction Company that it had "not received all materials from mills to fabricate windows. Expect same this week. Hardware promised for the 20th. Should be able to ship windows by end of the month".

The Flour City had also written on January 8th that it had "shipped one of the casement windows to Washington University" as requested by the architects for filtration test and that it expected to receive a report on February 12 "after which this window will be shipped direct to the job for installation as this sample window is one of the regular run * * * aluminum windows * * *".

On March 21, 25 and 28th Flour City sent telegrams stating it had been informed that Construction Company had received its money on the contract in February and requesting remittance; and on March 23d, Construction Company wrote Flour City that its representative would "visit the project with the architects one day next week for inspection on your windows, and if they meet the approval of the architects at that time, we will promptly forward check for payment of same."

On April 1, Merlin, Browne and Sherman, presumably a law firm, wrote the Construction Company, stating that it represented Flour City, who advised that "that * * * a balance of $13,213.11 was due them and since we understand that you received your money on the February application * * * kindly forward check to our clients".

The Oral Evidence.

J. F. Smith, superintendent of the Flour City, whose duty it was to install the windows, arrived on the job the first time November 13, 1939, and between that date and the 22nd, installed the jail windows. He returned to the job on December 20th and between that date and January 19th, he was engaged in installing doors, transoms, building entrances and spandrels or ornamenta-

tions over the sash and top of the windows. He did not complete the work on the door entrances because the building was not in condition to receive it. The materials for the latter work had been shipped on November 24th and received in due course.

Receipt of the casement windows was as follows: twelve were on the job when Smith appeared there on February 7th, which had been shipped January 31st; 16 more arrived February 9th; 20 on the 15th; 20 on the 16th; six on the 19th, which made 74; and the last or 75th was received on March 14th. Some of the aluminum thresholds and rails were set between the 5th and 7th of March. The remaining items were set on the 25th and 28th of March; he was working and finishing right behind the tile man. The adjustments upon casement windows were made after the building was occupied. All Smith's testimony was based upon the dates of the invoices, which had been furnished him by Flour City, and he had no other date from which he could fix the exact dates. The glass was not in all the windows when he installed them, and later someone else came and put it in. He was the representative of the Flour City in putting in these windows and, of course, had an opportunity to see the progress of the work on the building while he was there beginning on the 13th of November.

C. R. Schuler was the chief engineer for Flour City and looked after the manufacture, installing, etc., of windows for his company. Work could not proceed until approval by the architects of Flour City's drawings. During this same period his firm was furnishing similar materials for four other jobs in Louisiana as well as fifteen to eighteen in other sections of the South. The other jobs in Louisiana were done under a different name. While Schuler testified that he had submitted all the drawings of the entire job on July 27, 1939, which were "never returned to us", he admitted that several letters were written, telephone conversations were had and one of his representatives had visited the architects in Monroe on two occasions in an effort to get them to agree to the details, which had been submitted. The details for the jail windows were approved September 28th and they were installed, as above stated, between November 13th and 20th.

Construction Company had, on September 8th, requested that all the windows and materials be furnished not later than October first. Schuler admitted that "a lengthy exchange of correspondence by letter and telegram, together with telephone calls to the architects" had been carried on and the drawings were again submitted to the Construction Company and the architects on September 18th, but were not received back until October 2d, at which time they were not marked "approved". However, there was a letter from the architects dated September 26, referred to earlier herein. In this letter the architects wrote as follows:

"We are returning herewith one copy of revised drawing for aluminum windows as submitted by you from Flour City Ornamental Iron Company. These drawings are being returned subject to corrections as noted thereon and conditions as follows:

"(1) Weatherstripping:—It was intended in the specifications to permit a three-point metal contract as shown by "Polachek", or to permit a double felt weatherstripping similar to Kawneer's double line of felt weatherstripping giving two separate metal to felt contacts and one metal to metal contact. We note your section shows single felt and two-point metal to metal contact which conforms to none of weatherstripping for specified casements.

"(2) Infiltration Test:—This office will require one of the 5' x 7' 6" units to be used in the above mentioned job to be submitted to Washington University, c/o H. L. Ohle, Professor of Mechanical Engineering, for test. This test would require air filtration efficiency comparable to approximately 0.125 cubic feet perimeter of lineal foot of sash, perimeter at 25 mph wind pressure.

"Will you please forward this information to your subcontractor at the earliest possible date as we understand the time is getting short for the manufacture of windows for this job."

Schuler testified that promptly upon the return of these drawings and receipt of this letter on October 2d, materials were ordered for the windows as "I was confident the windows we had submitted details on were within the contract requirements and we went ahead on that basis without any further instruction", but had he received approval earlier he would have gone ahead immediately.

With respect to the air filtration tests, Schuler testified that he submitted to the architects one that had previously been made (in 1936) by the University of Wis-

consin, of some other windows—not a sample of the ones which were to be manufactured, and was informed by the architects that they would require a test of one of the actual windows from those which were to be installed. Therefore, it was only after the windows had been fabricated that one of them was sent to Mr. Ohle of the University of Washington, as directed by the architects. This report of the test was not sent to the architects until all the windows had been installed.

In the course of the controversy with the architects, Schuler took the position that they were wrong and threatened to take the matter up with the P.W.A.; that under the "or-equal" clause of the specifications what he had submitted complied with the contract, and this was really the bone of contention that caused the long exchange of correspondence, etc., in which the architects did not concede his point. On October 27th, the Construction Company wired Flour City to know when casement windows would be shipped. I have been unable to find any response to this message.

Nothing further passed between the Flour City, the Construction Company and the architects about these windows, except the arrangements for closing them with canvas, until January 8, 1940, when the communications heretofore referred to passed. And on the same date, that is, January 8th, the telegram heretofore quoted was sent about the test. As stated earlier this test had been requested by the architects on July 8, 1939. Schuler gave as his reason for not responding to this request until the 22nd of July, that he was submitting the matter to the Bureau of Standards as requested, but later admitted that he knew before that time the Bureau would not make the test. The truth of the matter was that he knew he test could not be made until· he had completed one of the windows, which were to be installed, because this had been required by the architects.

■ Schuler also admitted that the Construction Company had submitted to the architects all requests and communications of the Flour City and had reported the results promptly, and, in effect, that the fault lay with the architects insisting upon compliance with their interpretation of the contract and specifications. In any event he admitted that he had finally decided to go ahead on October 2, 1939. From that time until the first shipment of casement windows, made on January 31, 1940, some

119 days elapsed and the last window was not installed until March 14th. There does not appear any reasonable explanation for this long delay, unless it was the failure to get raw materials. On.the other hand the materials were obtained and jail windows were manufactured and delivered within about a month. The Construction Company had warned Flour City, on September 8th, that it was necessary for these windows to be installed by October 1st and that Flour City would be held responsible for any de-. lay. The architects' rulings on the matters in dispute, in the absence of other settlement, were binding, and Flour City took the chances involved in this delay resulting from its controversy with the architects. To say the least, the Construction Company should not be made to suffer because of this delay. It had on September 8th definitely informed Flour City that the architects had advised that "the details submitted by you do not conform to the requirements of the plans and specifications * * *" and that it had advised the Construction Company "would not ask for any changes in the details of the windows which are specified". Notwithstanding, the controversy was carried on until about the first of October. Schuler admitted he never resubmitted any drawings or details showing the changes which the architects had required in their letter of September 26th; nevertheless, he conceded that letter called for resubmission. In addition to these facts, Reed of the Construction Company testified and it was not denied by any one from the Flour City, that before the subcontract was made, the latter agreed to furnish windows manufactured by one of the three or four firms named in the specifications; but Schuler's position during the controversy was that, under the expression "or equal", he had the right to manufacture the windows himself. Flour City also contended that even if the windows had been furnished on time, certain plastering and tile work had not been completed when the Flour City representative went there, which would permit installing door frames, railings, etc. However, I am convinced that these matters were inconsequential and there was no appreciable trouble on this score. When the windows and materials were finally on hand and ready to install, the work of plastering, placing tile, putting of the frames and rails in place was carried on substantially together as usual and without any difficulty. This

does not seem to have been anything out of the ordinary.

In view of the above state of the record, I am impressed that the plaintiff is entitled to recover the damages which it suffered through the fault of the Flour City in not furnishing and installing the windows according to contract. Those items have been proven with reasonable certainty. Nothing has been offered to refute the testimony of witnesses showing that they were necessary expenditures, and the plaintiff should recover accordingly.